**Rhonda WIGGINS and James Van Rooyen, III**

v.

**SYNTHES (U.S.A.), Appellant.**

Superior Court of Pennsylvania.

Argued March 23, 2011.

Filed Aug. 12, 2011.

7. The parties may want to consider moving for the appointment of an out-of-county judge to hear this matter.

Geoffrey C. Lord and Mary Ann Mulla-ney, Philadelphia, for appellant.

Gustine J. Pelagatti, III, Philadelphia and Stewart J. Greenleaf, Jr., Blue Bell, for appellees.

BEFORE: BOWES, ALLEN, and FREEDBERG, JJ.

OPINION BY FREEDBERG, J.:

Appellant, Synthes (U.S.A.), appeals from the judgment entered in the Philadelphia County Court of Common Pleas in favor of Appellee, James Van Rooyen, III.[1] Appellant contends that Appellee failed to establish a products liability claim under the malfunction theory. Specifically, it maintains that Appellee's expert testimony was insufficient to establish each element of the claim. Finding no reversible error by the trial court, we affirm the judgment.

The trial court opinion sets forth the relevant facts and procedural history of this case as follows:

In November of 2005, Appellee, Van Rooyen, was a 15–year–old child with a four week history of right thigh pain. He was subsequently diagnosed with slipped capital femoral epiphysis ("SCFE"). "SCFE" is a hip disorder that affects children. This disorder exists when the upper end of the child's thigh bone slips at the growth plate. Appellee underwent emergency surgery at the Children's Hospital of Philadelphia on November 24, 2005. During the surgery two surgical screws manufactured by Appellant were implanted by the CHOP surgeons into Appellee's right femur. X-rays taken of Appellee's right hip on December 8, 2005 and January 10, 2006 revealed the two surgically implanted screws to be intact and unbroken. However, after the Appellee developed some complaints, X-rays were then taken on July 27, 2006, which revealed that a reslip had occurred producing a displacement and that the two surgically implanted screws had broken.

[D]uring the surgery performed on Appellee at Shriners Hospital on February 7, 2007, the two broken surgical screws were removed from his right femur and were discarded by personnel of the hospital. Subsequently, on December 10, 2007, Appellee had total hip replacement surgery for his right hip performed at CHOP.

In October 2007, Appellee commenced suit against Appellant asserting a claim of strict liability under the malfunction theory. A jury was selected on November 20, 2009, and the matter was tried before a jury on November 23 through November 30, 2009. On November 30, 2009, the jury returned with a verdict in favor of Appellee in the amount of $2,000,000.00.

On December 10, 2009, Appellant timely filed its post-trial motions. After a review of the briefs submitted by counsel for the parties and oral argument which was heard by this Court on April 22, 2010, this Court entered an order on June 23, 2010, denying Appellant's post-trial motions and entering judgment in favor of Appellees in the amount of $2,109,339.32, which included the jury verdict of $2,000,000.00 plus delay damages in the amount of $109,339.32. On June 23, 2010, Appellant filed its timely appeal to the Superior Court of this Court's order of June 23, 2010. On July 29, 2010, this Court entered an order pursuant to Pa.R.A.P. 1925(b) requiring [Appellant] to file a Concise Statement

---

1. James Van Rooyen, III, commenced this action while still a minor. His mother, Rhonda Wiggins, was a co-plaintiff when the lawsuit began. James reached majority before trial, and the verdict was rendered in favor of James only. Therefore we will refer to James as the sole Appellee.

of Errors Complained of on Appeal. On August 19, 2010, Appellant timely filed its Statement of Errors Complained of on Appeal.

(Trial Court Opinion, filed June 23, 2010, at 2–4).

Appellant raises the following issues for our review:

WHETHER, BECAUSE EACH ELEMENT OF [APPELLEE'S] CLAIM UNDER THE MALFUNCTION THEORY OF DEFECT REQUIRED THE DETERMINATION OF ISSUES BEYOND THE KNOWLEDGE OF LAYPERSONS, THE TRIAL COURT ERRED BY SUBMITTING [APPELLEE'S] CASE TO THE JURY WITHOUT LEGALLY SUFFICIENT EXPERT TESTIMONY TO ESTABLISH EACH ELEMENT OF HIS CLAIM, I.E.:

A. A MALFUNCTION OF EACH OF THE TWO SURGICAL SCREWS;

B. THE ABSENCE OF ABNORMAL USE OF THE TWO SURGICAL SCREWS OR OTHER REASONABLE, SECONDARY CAUSES OF THE MALFUNCTION; AND

C. THAT THE ALLEGED, UNSPECIFIED DEFECT IN THE TWO SURGICAL SCREWS WAS A SUBSTANTIAL FACTOR IN CAUSING, OR THE FACTUAL CAUSE OF, HARM TO [APPELLEE].

WHETHER THE TRIAL COURT ERRED BY SUBMITTING [APPELLEE'S] CASE TO THE JURY WHEN [APPELLEE'S] SOLE MEDICAL EXPERT FAILED TO OPINE TO THE REQUISITE DEGREE OF MEDICAL CERTAINTY ON THE FOLLOWING ELEMENTS OF [APPELLEE'S] CLAIM UNDER THE MALFUNCTION THEORY OR DEFECT:

A. A MALFUNCTION OF EACH OF THE TWO SURGICAL SCREWS;

B. THE ABSENCE OF ABNORMAL USE OF THE TWO SURGICAL SCREWS OR OTHER REASONABLE, SECONDARY CAUSES OF THE MALFUNCTION; AND

C. THAT THE ALLEGED, UNSPECIFIED DEFECT IN THE TWO SURGICAL SCREWS WAS A SUBSTANTIAL FACTOR IN CAUSING, OR THE FACTUAL CAUSE OF, HARM TO [APPELLEE].

WHETHER THE TRIAL COURT MISDIRECTED THE JURY AND ERRED BY FAILING TO FRAME THE JURY INTERROGATORIES SO AS TO DIRECT THE JURY TO DETERMINE WHETHER [APPELLEE] HAD PROVED KEY ELEMENTS OF HIS CLAIM UNDER THE MALFUNCTION THEORY OF DEFECT: THAT THE SURGICAL SCREWS WERE NOT SUBJECTED TO ABNORMAL USE AND THAT NO REASONABLE SECONDARY CAUSES WERE RESPONSIBLE FOR THE BREAKAGE.

■ Appellant's Motion for Post–Trial Relief sought judgment n.o.v. or alternatively, a new trial. When examining a trial court's denial of a request to grant judgment n.o.v., the proper standard of review is "whether, when reading the record in the light most favorable to the verdict winner, and granting that party every favorable inference therefrom, there was sufficient, competent evidence to sustain the verdict. Questions of credibility and conflict in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. Absent an abuse of discretion, the trial court's determination will not be disturbed." *Ferrer v. Trustees of University of Pa.,* 573 Pa. 310, 825 A.2d 591, 595 (2002) (citations omitted). "Our standard of review when faced with an appeal from the trial

court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion." *Schmidt v. Boardman*, 958 A.2d 498 (Pa.Super.2008), *aff'd*, 608 Pa. 327, 11 A.3d 924 (2011).

■■■ Pennsylvania courts have long "recognized a plaintiff's right to pursue an action in strict liability against the manufacturer of a product pursuant to section 402A of the *Restatement (Second) of Torts*. A plaintiff presents a *prima facie* case of strict liability by establishing that the product was defective and that the product caused the plaintiff's injury. In most instances the plaintiff will produce direct evidence of the product's defective condition. In some instances, however, the plaintiff may not be able to prove the precise nature of the defect in which case reliance may be had on the 'malfunction' theory of product liability." *Rogers v. Johnson & Johnson Products, Inc.*, 523 Pa. 176, 565 A.2d 751, 754 (1989) (citations omitted). In *Barnish v. KWI Bld. Co.*, 602 Pa. 402, 980 A.2d 535 (2009), our Supreme Court engaged in a comprehensive analysis of the malfunction theory:

> [A] plaintiff pursuing a case under the malfunction theory can assert a successful strict product liability claim based purely on circumstantial evidence in cases where the allegedly defective product has been destroyed or is otherwise unavailable. Although the plaintiff does not have to specify the defect in the product, the plaintiff nonetheless must present evidence from which a jury can infer the elements of a strict liability action, beyond mere speculation.

*Id.* at 539. *See Liberty Mutual Fire Ins. Co. v. Sharp Electronics*, 2011 WL 2632880 (M.D.Pa.) at *3 (recognizing viability of "malfunction theory" in Pennsylvania).

The Supreme Court in *Barnish* explained how the plaintiff establishes a *pri-*

*ma facie* case of products liability under the malfunction theory:

> While reminiscent of the logic of a *res ipsa loquitur* case, the malfunction theory requirements correlate with the three elements of a standard 402A claim. First, the "occurrence of a malfunction" is merely circumstantial evidence that the product had a defect, even though the defect cannot be identified. The second element in the proof of a malfunction theory case, which is evidence eliminating abnormal use or reasonable, secondary causes, also helps to establish the first element of a standard strict liability case, the existence of a defect. By demonstrating the absence of other potential causes for the malfunction, the plaintiff allows the jury to infer the existence of defect from the fact of a malfunction. For example, by presenting a case free of abnormal uses, such as using the product for an unintended purpose, the plaintiff can demonstrate that the product failed to perform as a reasonable customer would expect; thus, that it malfunctioned. Similarly, by eliminating other reasonable secondary causes, a plaintiff allows the jury to infer that a defect in the product caused the malfunction, as opposed, for example, to operator error or failure to service the equipment. Similarly, by presenting a case free of "abnormal uses" by the plaintiff and free of "other reasonable secondary causes," a plaintiff can establish through inference from circumstantial evidence the second and third elements of a 402A case, that the alleged defect caused the injury (as opposed to another cause) and that the defect existed when it left the manufacturer's control (as opposed to developing after the product left the manufacturer's control).

*Id.* at 541–42.

■■■ Appellant's first two issues challenge the sufficiency of the evidence sup-

porting the jury's conclusion that the surgical screws were defective when they left the possession of the manufacturer and that the breakage of the screws was the factual cause of harm to Appellee. "When reviewing the sufficiency of the evidence . . . this Court must determine whether the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the verdict winner, was sufficient to enable the factfinder to find against the losing party." *Zeffiro v. Gillen*, 788 A.2d 1009, 1013 (Pa.Super.2001) (citation omitted); *see also D'Alessandro v. Penna. State Police*, 594 Pa. 500, 937 A.2d 404, 410 (2007).

> [I]n a products liability case the plaintiff seeks to prove, through whatever means he or she has available under the circumstances of the case, that a product was defective when it left the hands of the manufacturer. In some cases, the plaintiff may be able to prove that the product suffered from a specific defect by producing expert testimony to explain to the jury precisely how the product was defective and how the defect must have arisen from the manufacturer or seller. In cases of a manufacturing defect, such expert testimony is certainly desirable from the plaintiff's perspective, but it is not essential. The plaintiff, even without expert testimony articulating the specific defect, may be able to convince a jury that the product was defective when it left the seller's hands by producing circumstantial evidence. Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident

does not occur absent a manufacturing defect.

*Dansak v. Cameron Coca–Cola Bottling Co.*, 703 A.2d 489, 496 (Pa.Super.1997).

 Appellant asserts that Appellee's expert medical witness, Sheldon Simon, M.D., failed to establish malfunction because he testified that the surgical screws were "ineffective,"(N.T. Dep. 9/13/09 at 56), rather than defective. Appellant further notes that Dr. Simon did not testify to a reasonable degree of medical certainty that the surgical screws were "ineffective." Expert testimony must establish, to a reasonable degree of medical certainty, that an injury stemmed from the alleged tortious conduct. *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1285 (1978). "In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety. . . . An expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, 'reasonable degree of medical certainty.'" *Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa.Super.2007), *aff'd*, 605 Pa. 381, 989 A.2d 1277 (2010).

We agree with Appellee that he was not required to present testimony that the screws were "defective". Under the malfunction theory of product liability, the jury may infer the existence of a defect through circumstantial evidence of a malfunction in the absence of abnormal uses or reasonable secondary causes. *Barnish*, 980 A.2d at 541–42.

As a whole, Dr. Simon's testimony provided evidence that the surgical screws were defective in failing to keep Appellee's hip together until it healed. Dr. Simon testified as follows:

> And basically what we see in this particular case is those screws broke before [the hip healed] and, therefore, it was

ineffective in doing its job, which I can only relate to the fact that there—in the manufacture of these particular screws that there—that it was weak in that area; that's the only way I can consider it, that way.

(N.T. Dep. 11/13/09 at 57). He also testified:

Q: What did you mean when you said these cannulated screws were ineffective?

A: Well, it takes a certain amount of time for the bone to heal. In other words, like any fracture, there's a given amount of time that the body needs for the little bone cells in there to make bone to connect the two parts. Different parts of the body have different time frames for this. It's different for a finger than it is for, let's say, a tibia, a lower leg bone.

When we put an internal device in like plates or screws or sometimes rods, what we're saying is that—whatever we put in has to hold it together until the body takes over the job. After that, the screw or plate or rod is really superfluous, it's not needed, and often we would take it out. In this case, it appears as if the screws didn't do their job.

(Id. at 53–54). Appellant asserts that the following testimony by Dr. Simon on cross-examination does not constitute an opinion that the surgical screws were defective because Dr. Simon used the word "defect" in a rhetorical question:

Now I ask you if you, therefore, have a situation where the screws break, both of them break under this, when most of the time you only need one to hold, well, until the bone heals, what else can I infer other than that, that there was a defect in the screws?

(Id. at 121). Appellant makes a similar argument with respect to the following

testimony of Dr. Simon on cross-examination:

But there's a certain time frame in which the non-union could occur and when the screws can hold. And until that time frame is reached, if it breaks before that, then you have to say—you have to ask the question whether there is a defect in the things that are holding it.

(Id. 121–22). Focusing on the substance of Dr. Simon's testimony, rather than isolated choice of words, and viewing the testimony in the light most favorable to Appellee as verdict winner, see Ferrer, supra, Dr. Simon opined that the surgical screws failed to perform as reasonably expected. Accordingly, there was sufficient expert testimony to establish that the surgical screws malfunctioned, and thus, were defective.

■ Appellant next asserts that Appellee failed to meet his burden "to offer expert testimony that provided a basis for the jury to find that no abnormal use had occurred and that there were no reasonable, alternative causes for the breakage of the surgical screws." (Appellant's Brief at 26). At trial, Appellant's expert, Thomas Corcoran, M.D., testified that the surgical screws broke because Appellee's bones never healed. (N.T. 11/25/09 at 42). Appellee's expert, Dr. Simon, testified that the screws were supposed to keep the corrected hip in "position until the bone heals," (N.T. Dep. 11/19/09 at 40), which may take up to six months. Id. at 123. However, Appellee began experiencing pain and developing a limp within two months after his surgery. (N.T. 11/23/09 at 57; N.T. 11/24/09 at 17). An x-ray taken on July 27, 2006, showed that both screws broke at the growth plate. (N.T. Dep. 11/19/09 at 43). Dr. Simon testified that screw breakage in the SCFE is not a

common complication. (*Id.* at 49). He further testified:

Q: Do you agree with [Dr. Corcoran's] statement that the two Synthes screws placed in the right femur on November 4, 2005 broke as a direct result of a known complication of SCFE called non-union of the physis?

A: The way it's worded in the answer, I have to say no.

Q: Why?

A: Because I think that the screws themselves contributed to the re-slip of it.

(*Id.* at 66–67). Dr. Simon presented sufficient evidence to support a conclusion by the jury that the non-union of the bones did not cause the surgical screws to break. He also testified that the x-rays of Appellee taken two weeks and six weeks after the November 2005 surgery showed that the screws were in place and there was no change in the position of the bones, "which is what you like to see." (*Id.* at 41). This testimony eliminates medical malpractice as a cause of the breakage of the surgical screws. Accordingly, Appellee presented expert testimony eliminating two secondary causes of the malfunction.

■■■ With respect to eliminating abnormal use, Appellee testified that after the November 2005 operation, he followed his physician's instructions regarding limitations on walking and moving his hip. He also followed his doctor's instructions not to play basketball or football. (N.T. 11/24/09 at 17). Appellee's mother testified that after the November 2005 operation Appellee did not engage in any strenuous activity or exercise. (N.T. 11/25/09 at 93). In a malfunction theory case, there is no requirement that evidence regarding the absence of abnormal use be presented by expert testimony. *See Barnish, supra; Johnson, supra; Dansak, supra.* Accordingly, lay testimony of Appellee and his mother was sufficient to allow the jury to conclude that abnormal use did not cause the surgical screws to malfunction.

■■■ Appellant next asserts that the evidence was insufficient to establish that the alleged defects in the surgical screws were the proximate cause of Appellee's injury: that is, "[Appellee's expert] never testified that in his opinion and to a reasonable degree of medical certainty, the alleged defect in the two surgical screws was a substantial factor in bringing about the injuries [Appellee] suffered...." (Appellant's Brief at 30). Appellant emphasizes that Dr. Simon's statement that the breakage of the surgical screws "contributed" to the re-slip does not establish causation. Further, Appellant argues that Dr. Simon did not make his statement to a reasonable degree of medical certainty.

■■■ However, Appellee was not required to prove by expert opinion that the defective surgical screws caused his injuries. As previously noted:

[B]y eliminating other reasonable secondary causes, a plaintiff allows the jury to infer that a defect in the product caused the malfunction, as opposed, for example, to operator error or failure to service the equipment. Similarly, by presenting a case free of "abnormal uses" by the plaintiff and free of "other reasonable secondary causes," a plaintiff can establish through inference from circumstantial evidence the second and third elements of a 402A case, that the alleged defect caused the injury (as opposed to another cause) and that the defect existed when it left the manufacturer's control (as opposed to developing after the product left the manufacturer's control).

*Barnish,* 980 A.2d at 542. The surgical screws were intended to hold the corrected position of Appellee's hip until the bone

healed. (N.T. Dep. 11/19/09 at 40). The healing process could take up to six months. (*Id.* at 123). However, Appellant experienced pain and developed a limp within two months of the surgery. (N.T. 11–24–09 at 17). An x-ray taken on July 27, 2006 showed that both screws had broken at the growth plate, which was the place that the screws were supposed to hold together. (N.T. Dep. 11/19/09 at 43). Thus, the screws broke, the hip failed to heal, and Appellant sustained permanent injuries. (*Id.* at 78). The circumstantial evidence presented by Appellee was sufficient to establish that the defective surgical screws caused Appellee's injuries.

Furthermore, the record indicates that Dr. Simon testified to a reasonable degree of medical certainty that the surgical screws caused the November 2005 operation to fail, causing Appellee's injuries:

Q: Doctor, do you have an opinion based upon a reasonable degree of medical certainty as to the cause of the failure of the initial operation?

A: Yes.

Q: What is that opinion?

A: That the failure was that the bone— the bone of the SCFE, the two sides of the SCFE, did not unite before the screws broke.

Q: Doctor, does your opinion as to the cause of this failure necessitate future— past and future operations in this case?

A: Absolutely.

(*Id.* at 61–62). Accordingly, Appellee presented sufficient circumstantial evidence and direct expert testimony to establish that the malfunctioning surgical screws caused Appellee's injuries.

██ Appellant next asserts that the verdict slip insufficiently stated the questions to be answered by the jury. The verdict slip directed the jury to answer the following two questions:

1. Do you find that that the cannulated screws manufactured by defendant, Synthes (USA) were defective when the product left the possession of the manufacturer?

2. Do you find that the breakage of the screws was a factual cause of harm to the plaintiff?

██ Appellant asserts that the trial court erred by denying its request to include questions requiring the jury to find that Appellee had proven that the surgical screws were given normal or anticipated use only, and that no reasonable secondary causes were responsible for the breakage of the surgical screws. (N.T. 11/24/09 at 154). It is within the discretion of the trial judge whether to grant or refuse a request to submit special interrogatories to the jury. *Walsh v. Pennsylvania Gas & Water Co.*, 303 Pa.Super. 52, 449 A.2d, 573, 577 n. 1 (1982). Under the malfunction theory of products liability, the absence of abnormal use and secondary causes is incorporated into the question of whether a product is defective:

First, the occurrence of a malfunction is merely circumstantial evidence that the product had a defect, even though the defect cannot be identified. The second element in the proof of a malfunction theory case, which is evidence eliminating abnormal use or reasonable, secondary causes, also helps to establish the first element of a standard strict liability case, the existence of a defect.

*Barnish*, 980 A.2d at 541. During its charge to the jury, the trial court informed the jury of the following elements of a products liability cause of action:

Now, a plaintiff in a strict liability case may prove its case by showing the occurrence of a malfunction of a product during normal use. The plaintiff need

not prove the existence of a specific defect in a product.

The plaintiff must prove three facts:

That the product malfunctioned;

That it was given only normal or anticipated use;

And that no reasonable secondary causes were responsible for the harm.

(N.T. 11/30/09 at 107–08). Because the trial court properly informed the jury regarding the elements Appellees had to establish in order to prove that the surgical screws were defective, the verdict slip was proper. Accordingly, there is no merit to Appellant's claim of trial court error.

For these reasons, the order of the trial court is affirmed. Jurisdiction relinquished.